Thank you. I'll call the next case. In Re Towne, Mr. Dobbs. Thank you, Your Honor. May it please the court. Seth Dobbs on behalf of the Margolis Law Firm, here on behalf of the appellants. Any rebuttal time? Yes, I'd like to reserve three minutes. All right. Proceed. Thank you, Your Honor. In this case, under 11 U.S.C. 506C, as further defined by the McKeesport-Steele case, the secured creditor in this matter should be held responsible for the costs and services for which it could have reasonably expected to benefit and did benefit from. The services of special counsel in this matter were reasonably expected to benefit the secured creditor in this case. Specifically, the special counsel maintained... Did you bill for or did you seek to collect for work that was done to research potential claims against the secured creditor? Services were rendered to ensure that the franchise was protected. So actions needed to be taken against BMW North America as well as BMW Financial Services. So in that regard, yes. All right. And the district court looked specifically at what the Margolis Law Firm did and said. You were taking actions that were antithetical to the lender. You were litigating against the lender. That's clearly not for the direct benefit of the lender, is it? Well, I'd say you need to differentiate between BMW Financial Services and BMW North America, even though they're owned by the same parent company. When we speak of BMW Financial Services, we might be more apt to say Bank of America or lender to show that they are separate entities. We had to litigate against BMW North America to protect the franchise. Otherwise, the only thing that would be saleable in this bankruptcy would be the facilities themselves, which didn't yield anywhere near the value of what the franchise would yield. Was it BMW NA or BMW FS that was seeking to lift the automatic stay so it could collect against the collateral? BMW FS. And you opposed that? Yes, we did. Okay. So isn't that something contrary to the interests of the lender? Not necessarily, no, because what we were doing... Well, the lender evidently thought it was against their interests. They wanted it, and you said, we're not going to let you do it. We can stop you. There's a lot of things in this case that the lender wanted to be done that weren't necessarily in the best interests of the lender. So you determine what's in the best interest of the lender? No, that's for the court, Your Honor. Isn't a pretty good hint about what's the best interest of the lender what the lender thinks is in the best interest of the lender? Not necessarily in this case, which is why this case is an interesting one. Through discovery, emails and letters and correspondence had been going on for months and months and months between BMW Financial Services, BMW North America, and the favorite son lender, the LSI, as referenced in the briefs. Is the determination that the actions of the special counsel were antithetical a factual determination? I'm sorry, can you repeat that, Your Honor? Don't we have to review all this essentially on a clearly erroneous standard? Because these are essentially factual findings by the lower court, yes? Yes, Your Honor. Yeah, okay. And that's true for the finding of whether it was necessary and whether there was a direct benefit? Yes, Your Honor. Okay. And I would point out that direct benefit should be viewed as this court viewed it in the McKeesport Steel case, which broadened the interpretation under the Flagstaff case. Sure, but even under a broad interpretation, you're acknowledging that whether there's a benefit or not is a factual matter for the finder of fact to be dealing with and for us to be reviewing on a clearly erroneous basis, if I understood you right? Yes, that's correct, Your Honor. Okay. There's an assertion in the briefing that FS should be viewed as consenting to the services that were rendered by the special counsel, right? Yes, Your Honor. But it's the case, isn't it, that after notice and hearing, there was no objection lodged by special counsel to the carve-out that left special counsel out? Isn't that right? That's one regard. But special counsel feels it was entitled to fees under 506C, which would be separate and apart from the carve-out. Sure. Let's just focus on this. Sure. If you had your opportunity, you were noticed, there was a hearing, no objection, how is there any basis to come in and say, wait a second, they really were consenting to me doing what I did? They told you they weren't. They had their carve-out, you weren't in it, and you knew about it. How does your consent argument hold up? Well, I wouldn't say that for the fact that we weren't included in the carve-out would mean that they didn't consent to our services. I think those are two separate issues. I think that they did consent to our services by allowing special counsel to continue. Doesn't the carve-out specifically, I mean, what's the point of the carve-out except to say this is what we're willing to pay for and you're not in it? I mean, that's the, I guess I'm having a hard time understanding how those issues are as separate as you're suggesting that they are, Mr. Dodd. I would say that the services were provided before the carve-out, so special counsel continued all along under the assumption that eventually special counsel would be paid for those services. At the end of the day, when the sale was put before the court with the carve-out, at that point, for the first time, special counsel found out, hey, I'm not going to get paid on this. Right, but special counsel didn't object to that. Well, again, special counsel felt that it would be provided funds under 506C, in addition to the fact that had special counsel jumped up and argued at that point that, you know, we were entitled to fees under this carve-out and hold up the sale, at that point, they could have been held responsible for losing $4.5 million over the $500,000 that the facilities was worth. Because there was a notice of termination that was issued by BMW to say the franchise in this particular property will be terminated within 15 days of July 24th, 2009. So but for the services of special counsel, all that would be left for the sale would be the facilities at that location, which are a single-use facility. The blue sky and the value of the franchise are what, at the end of the day, everybody was arguing about. Your, even under 506C, I mean, not even under, especially under 506C, you've got to demonstrate that the expenditures are reasonable and necessary to preserve, or for the preservation or disposal of the property and that they provide a direct benefit, right? That's the standard, those two prongs? Yes, Your Honor. Okay. So do you have any proof at all that the preserved property here, which the collateral was the cars and the land, right? The inventory and the land? Correct, as well as the franchise. Was the franchise collateral? I'm sorry, no, it wasn't, Your Honor. Just the assets, the cars and the land. The cars and the land. So is there any indication in the record that the cars and the land sold for more than they would have because of the efforts of Mr. Margolis? I would venture to say yes. What's that proof in the record? I would say that there are emails and letters that have gone back and forth between counsel for the favored son buyer in this case and Mr. Margolis prior to the conversion where negotiations were being had as to what the property was worth, how much a letter of intent was issued, and that definitely speaks to the value of those assets. And, again, the majority of the funds stemmed from the franchise itself, which wouldn't have been in existence. What's the evidence that says that? There was a termination letter issued by BMW on July 24, 2009. Right. What's the evidence that shows what the value of the collateral was with or without the franchise? I believe that in the sale documents, the contract of sale differentiates between various assets and worths. Is the position that you've got under these circumstances that it's really an equitable matter? I guess you've made a few arguments. You've got this 506 CR and then you've got your equitable estoppel argument. At the end of the day, it feels like what's being argued is, hey, what happened here is unfair. But can you point us at something specific as to your equitable estoppel argument, particularly that was either a representation that was relied on or a special relationship that allowed Mr. Margolis to trust in the silence of the lender? Sure. What I would point out would be that at the time of the conversion, there was a stalking horse bidder for $6 million. That was provided by Mr. Margolis, the Margolis law firm. At that point, there was a franchise and a stalking horse bidder for $6 million. And the lender, in this case, I'm not going to say BMW Financial Services because it's misleading. The lender, in this case, said, okay, great, we have a sale for $6 million, but we're not going to accept that sale unless you sign a release for another entity, which is in breach of the motor vehicle law for the state of New York. I'm not sure I understand how that plays into an equitable estoppel argument. You can correct me on the law if I've got it wrong, but my understanding was that the law required for an equitable estoppel that there either be a misrepresentation that was relied on or some reliance on silence in the context of a relationship where the party doing the relying was entitled to rely on the silence. And I'm looking for you to tell me if you've got something of that character that you can point to in the record. Sure. What I would say is I would point to what came out during discovery is that the lender in this matter allowed special counsel to do everything that it did, put ads in newspapers, find buyers, take an action in state court to preserve the franchise, while all the while they had been communicating with an individual that they intended and wanted to purchase this asset at the end of the day. That might make them bad people, but does it make them subject to an equitable estoppel? I believe that it would because they allowed the Margolis Law Firm to continue making efforts to continue accruing fees all the while when it would have been moot and unnecessary. But yet they sat silently by and allowed. What's the legal relationship that the Margolis Law Firm has with BMW that required BMW to come to them and talk to them about that? Don't you have to show that kind of a special relationship in order for the equitable estoppel doctrine to pull you in? I feel just the matter of this case would be enough, Your Honor. The fact that the matter that you had a debtor that owed money to BMW Financial Services and the Margolis Law Firm was acting as special counsel to this litigation, to this bankruptcy, and because of that relationship they would be entitled to fees. Okay. Thank you. Thank you, Mr. Dobbs. Ms. Sternheimer? Good morning, Your Honors. Joanne Sternheimer from Daly, Mooney & Glassett are appearing on behalf of BMW Financial Services. So is this really an all-or-nothing situation? Weren't there some amounts expended in the marketing and attempt to sell the dealership that were within the scope of 506c? No, Your Honor. As the district court ably pointed out, there was no benefit to BMW FS until BMW FS, after conversion, working with the franchisor and the trustee, conducted a whole new process to sell the assets and, in fact, sold the assets itself. So there was no benefit brought about by those additional services. That's a curious thing to me because the district court also said this on pages 14 and 15 of the slip opinion. Special counsel makes no effort to limit its claim for fees to only those actions which were primarily for the benefit of BMW FS. Well, that sentence certainly implies that some of what it did was, quote, primarily for the benefit of BMW FS. And if that's true, why was it appropriate for the district court to say to the Margolis Law Firm, you get nothing, instead of saying to the Margolis Law Firm, well, you don't get this much, so tell us, break this down in a way that we can fashion the appropriate fee award. Respectfully, Your Honor, I don't think that that statement implies that there actually was any benefit to BMW FS, only that the Margolis Law Firm didn't make any efforts to prove which ones were for the benefit of FS. And the district court later went on to say that there was no benefit to FS until FS itself sold the assets. What's the purpose of saying you didn't make an effort to separate out the actions which were primarily for the benefit of BMW FS unless there actually were some services that were primarily for the benefit of BMW FS? Well, I think it's to point out, Your Honor, that in order to come before the court, you should have at least taken that effort to see which activities benefited BMW FS, and you didn't. And without, frankly, the Margolis Law Firm having taken those steps, which they did not take, there really was no basis for the court to judge whether or not there was any benefit. Yes, well, wasn't the burden on Margolis to say, here's what we did that benefited? They were saying everything we did, even when we were opposing the stay, opposing relief from the automatic stay. This court has ruled that the burden of demonstrating benefit under 5060 rests with the moving party. The Margolis firm did not do that. The district court's opinion in that particular statement may have been pointing out that the burden was on them and it wasn't carried. I don't think it was suggesting, necessarily, that there was any benefit. Let me give you some of your own words, if I can, or somebody from your firm. This is from the answering brief on page 8. Despite being ready, willing, and able to liquidate the collateral and property, given the offer from Mr. Massinio, BMW FS agreed to forbear from exercising its rights under the orders for relief to allow the debtors a period of time to sell the collateral and property. Is that an admission that the offer from the stocking horse that Margolis firm brought to the table prompted forbearance by FS? I think it's true that because there was an offer on the table and there was a representation that we could go ahead with the sale within two weeks, I think it was the time frame at the time, that, okay, we will hold back from exercising our rights under the order for relief and we will allow you to try to sell these assets. However, what that statement doesn't encompass, there were very specific conditions of which special counsel was aware for a sale at less than the full value of our lien to go forward and for us to consent. Understood. I know you had releases you wanted, et cetera, et cetera. But the point is they brought something to the table. You accepted that that was something significant enough for you to forbear, you, your client, obviously. Sure. And in fact, you did forbear, and that had as a consequence keeping the franchise alive, did it not? No, it did not. I'm not sure what to take from your assertion that they would have, they were ready, willing, and able to foreclose, but they chose not to because of something Margolis did, unless it means something Margolis did helped keep the franchise alive. Doesn't that have to follow from the admission that you made on page 8? No, Your Honor, it doesn't. At the time that the Missinio was brought to the table as the stalking horse bidder, the franchise was at that time still alive. You have a bidder, you have a buyer here before me. I'll give you the opportunity to go ahead and sell to that bidder if you are able to. Sure, but your statement in this brief is we were ready to liquidate. We were, quote, ready, willing, and able to liquidate. Correct, Your Honor, but we were still significantly behind having a buyer in front of us in that process. So at that time, we had filed a replevant action in state court. Right. We had moved for relief from stay in the bankruptcy court. All of which the Margolis firm was fighting against, right? Correct, all of which they were fighting against. And they were fighting against it because of their impression, I suppose, that a going concern is better than a concern in liquidation, right? Correct, and here I think maybe is where there's a little bit of confusion. BMWFS was moving for relief from stay so that BMWFS could go back to state court and complete our replevant proceeding. What special counsel has been arguing is that had they allowed BMWNA to get relief from stay, that's the franchisor, the franchisor would have terminated the franchise. We had taken the position since the beginning, and history bore this position out, that had we been allowed to go back to state court, the finance company, been allowed to go back to state court to replevy our assets and foreclose on the real estate, we would have worked with the franchisor to keep the franchise alive so that the whole thing could be sold as a package. In fact, after the... I'm not sure what to make then of your statement that you were ready to, quote, liquidate the collateral and the property.  You were, quote, ready, willing, and able to liquidate the collateral and the franchise, but, quote, given the offer from Mr. Massinio, you agreed to forbear. That sure sounds like a statement that we were ready to let the ax drop, he brought something to the table, and we decided to let it live. From the finance company's point of view, for us to go and liquidate the collateral, we have to go back to state court, we have to get our replevant, and then we have to find our own buyer to sell the collateral to. We're in bankruptcy court now, and we believed we could do that because we believed that N.A., the franchisor, would work with us in not terminating the franchise before we found a buyer. But here we are in bankruptcy court with that pending action, with the franchise still in place, and a buyer before us. Not three months of going through the replevant proceeding, looking for our own buyer, a buyer before us. Right. He brought somebody to you, and that helped you, did it not? No, it did not, because he could not sell the assets to that person. Well, you thought it was enough of a help that you didn't continue with all the things you just said. Your Honor. It sounds like, on the one hand, you're saying, he brought something to the table that saved us a lot of hassle because we wouldn't have had to go through the replevant, we wouldn't have had to do these other things, and we decided to forbear because of it. And on the other hand, you seem to be saying, but that did nothing for us at all. That could have saved us a lot of hassle, but that did not save us any hassle. In fact, caused us additional hassle. Now, this is a Chapter 11 case, and I think it's important to point out that a Chapter 11 case, at its very best, is a series of negotiations among parties with competing interests. You give a little, I give a little, we work together, and hopefully at the end of the day, most of us come out with more than we might have had otherwise. So, in this case, and this cooperation, by the way, that FS agreed to, was very limited. We'll give you two weeks. Get a contract in writing. Put this offer on the table. Get a motion filed. And then we need to have a sale hearing by a date certain. None of those things happened. I think the motion was filed timely. The hearing was set according to our deadlines. And, by the way, this is a written agreement where time is of the essence, written in the agreement. Can I ask about that time is of the essence? Because there's an argument made by Mr. Dobbs' firm that the work that was going on by the Margolis Law Firm went on for a substantial period of time, and you knew it. As they put it, you sat by and watched them go through a whole series of efforts to bring in a stocking horse, to find other bidders, to see how much money could be brought to the table for a live franchise. And that, in the end, you chose to undercut that, but that doesn't mean that what was happening wasn't being done in a way that was of substantial and direct benefit to you. And you shouldn't be heard to say, having chosen at the end your own, as they like to put it, favorites. I don't know where that phrase comes from, but that's the way they characterize it. It's fundamentally unfair and inequitable for a bankruptcy court to appoint a special master and then let the lender pull the plug after watching a person expend months of effort, hundreds of thousands of dollars, excuse me, tens of thousands of dollars in fees. Where's the flaw in that? The flaw in that reasoning, Your Honor, is that we didn't, you know, put the kibosh on the sale at the end. We told special counsel and the debtor and everyone at the table, and there were numerous in-chambers conferences and numerous hearings, we told everyone at the beginning, if you don't have $9 million, which would be sufficient to satisfy our sale, you are going to have to give us releases from the principals and the debtors or we will not consent to the sale as we are entitled not to consent under 363F. That was a known fact. When you say we, are you talking about we FS or we NA or we both of us? We, me, and FS. I'm sort of lumping myself in with my client. Sure, but their argument to us is FS was not really looking out for its own interests. FS was looking out for NA's interests, and the trustee didn't even ask about the quality of the claims that were being prepared that would have enhanced the value of the estate. And so you really shouldn't even listen to them when they talk about interests of the lender because there's not really an untainted lender here. Special counsel has made those arguments since the beginning of this case, and I think it's important for the court to know that counsel for the franchise or BMW NA was at every single one of those hearings, every single one of those in-chamber conferences. And as I addressed on the record at one of the sale motions, counsel for the franchise or made those requests himself, was more than able and more than willing to request release on behalf of NA himself. I requested releases only on behalf of FS, and that is also reflected in the record in my moving papers, my moving affidavit at paragraph 15. We only requested it on behalf of FS. NA was more than capable of requesting their own release, and they did. And you guys weren't hand in glove? We were not hand in glove. We're represented by separate counsel. We're separate. We are entirely separate entities, and my understanding, I know what my client's reasoning is for looking for a release. My understanding from FS is that there are different reasons for asking for the releases. Okay. Thanks. Any other questions? No. Okay. Thanks, Ms. Sternheimer. Mr. Sedano. Good morning, Your Honor. As it pleases the Court, Anthony Sedano, Tranktee Pasquale De La Ferra, and Sedano on behalf of the Chapter 7 trustee, Joseph J. Newman. I've allotted myself three minutes, not because my client's paying me by the word, but because we fully support and incorporate all the arguments by BMW. Now, there were a couple questions that were asked. Judge Manaske asked whether or not all of the services were beneficial and counsels were responsible. Well, we prohibited the termination. We did research, and that ultimately benefited. They also did research with respect to challenging a $9 million claim and reducing it to $6 million. There's no separation to that. But with respect to challenging the BMW claim, this is why I believe this appeal, all through the process, has been frivolous. First, that supposes that special counsel knows better than BMW and its officials and executives that throughout the world negotiate these franchise agreements, that they don't have the business judgment, wherewithal, to make a determination as to whether or not they should terminate the stay, not terminate the stay, seek replevant or not replevant, and do what the collateral, what they desire. Secondly, it also presupposes. Let me ask you a question there, Mr. Sedano. Going to what I was asking Ms. Sternheimer, their argument in response to that seems to be, we're not dealing with an ordinary lender here. We're dealing with a lender which is actually a part of an arm of the franchisor and that the franchisor's interests were to prevent facing tort liability for bad things they had done. So this isn't this ordinary circumstance where a third-party lender is going to look out for a third-party lender's interests. This is a lender that's looking out for a bad actor's interests. That's the pitch I take it from them. So what's wrong with that? Why shouldn't we view that with a somewhat different lens than we would a third-party lender? Well, Your Honor, first of all, with regard to these tort claims and with respect to the allegation of my adversary, I think Your Honor mentioned it before about whether or not the trustee looked into anything. We didn't talk to someone. We had extensive discussions. We copiously reviewed all of the documents. We talked to BMW. We talked to their counsel. We looked at the documents. And we felt at the end of the day that in the best interest of this estate and these creditors was to do this sale and waive the releases. After due diligence, after the trustee's business judgment, that was not challenged. So to make that statement is offensive because at length, we looked into those allegations. I would say, Your Honor, that the other part of this is that the counsel makes an argument that somehow the trustee and BMW and LSI conspired to somehow cut them out of the process. And I think that Judge Hayden, in her opinion, adequately addressed this. And I kind of call it cerebrally as a smackdown. And this is with respect to the estoppel argument. Special counsel cites no case, statute, or other authority to indicate that such a form of estoppel has ever been recognized and instead dedicates nearly 20 pages of its brief to providing long absurds from email between reps of the parties regarding litigation and negotiations with LSI. Then the next sentence goes to the point about the strict standards of 506C. If the court were to accept special counsel's argument that these negotiations provided an equitable basis for the right to collect fees from the collateral, the court would effectively add fairness and balancing of the equities components to 506C, substantially relaxing the strict standards that the law imposed to recover fees from the secured assets. Why are we here today? Why? My client filed a motion to approve this sale and specifically request a carve-out. And I think, as Tom Cruise would say, it was crystal clear the carve-out was for the trustee and his professionals. They never appeared. They never sent in a letter. They never moved for reconsideration of that. They never appealed that order. So it's really the height of hypocrisy to now come in and say, oh, by the way, we're entitled under 506C. Their time and their day was then. They've wasted our time, our money, and our effort on a motion to reconsider and an appeal, and now we're before Your Honor. There's been no basis, and the records below clearly establish that their services were not necessary, not beneficial, there was no consent, and any of the Third Circuit requirements for that type of claim were not found, Your Honor. Okay. We got your position. Thank you, Your Honor. Mr. Dobbs. Thank you, Your Honor. I'd like to point out a couple of things. When counsel for BMW was speaking, she stated that at the time of the sale, at the time when the Stocking of Horses bidder was presented, all of these times there was a franchise in place. And she went further to say that she would have worked with BMW FS to present and preserve a franchise so that it could be sold as an ongoing business. If there was no special counsel in this case, BMW FS would have moved in for a pleb and stripped the dealership of anything that it had. BMW NA would have come in and stripped the dealership of its franchise. It would have been an empty, soulless building. Because of the actions of special counsel at the time the Stocking of Horses bidder was presented and at the ultimate time of sale, there was a franchise in place, there was an ongoing business, there were cars, there were employees. How can you say that? I mean, ultimately the decision whether to terminate the franchise would have been with the franchisor. Had special counsel not moved before the New York court, there would have been no franchise, yes. And at that point, there would have been nothing saleable to provide funds to pay off BMW FS. But instead, because of the actions taken by special counsel... Well, that's not, you're not, I don't think you're being responsive, Mr. Dobbs. Judge Van Anstey, I don't want to put words in his mouth, but I'm curious to hear the answer to this too. You're saying there would have been no franchise. Well, that was strictly the decision of the franchisor, right? If they wanted to keep the franchise alive because it was worth more to them alive than dead, that was exclusively within their power to make that call about whether to keep it alive. So how can you say it would have gone down but for your efforts? If special counsel hadn't moved to enjoin the franchisor from terminating, BMW FS would have not received nearly $6 million for a sale of this asset. How, which expert said that? Which expert said that? What witness said that? I think it's... But for the efforts, but for the efforts of Margolis. Well, there's an order that was in place throughout the entire duration of the bankruptcy proceeding from the New York state court enjoining BMW NA from terminating the franchise. But for that, the letter that was sent out by BMW would have terminated the franchise within 15 days. So because that injunction was in place pursuant to New York state law, BMW FS had something at the end of the day. With respect to Mr. Sedano's comments that they performed some due diligence because they contacted BMW FS and BMW NA to look at these claims, they never once contacted the debtor. They never once contacted special counsel to determine what claims, the veracity of the claims, the strength of the claims. They merely contacted BMW. That's it. So I think it's clear that BMW FS benefited from the actions of special counsel in this case and that accordingly under USC 506C, special counsel should receive some compensation for that. Okay. Thanks. If you'll give me just a minute with my colleagues here. Okay. Can I get counsel to approach for just a moment?  Okay. Thank you. All right.